*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WOODS, Minors.

UNPUBLISHED
January 23, 2020

No. 348740
Clinton Circuit Court
Family Division
LC No. 19-028536-NA

Before: BOONSTRA, P.J., and TUKEL and LETICA, JJ.

PER CURIAM.

Respondent-father, appeals as of right the trial court's termination of his parental rights over the two children, twins GW and RW, under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and 712A.19b(3)(j) (reasonable likelihood of harm). On appeal, respondent argues that the trial court erred in determining that the statutory grounds were proven by clear and convincing evidence and that termination was in the children's best interests. We affirm.

The children's mother died on August 17, 2017, and they lived elsewhere until respondent established paternity. Children's Protective Services (CPS) became involved when there was a complaint that respondent was an inappropriate caregiver; however, after respondent established paternity, CPS denied the complaint. Thereafter, respondent remarried.

In June 2018, CPS again became involved with respondent's family because there were reports of improper supervision and physical abuse. Although CPS closed its investigation, it offered respondent parenting classes and explained that he should not allow the children to remain unsupervised by their paternal grandmother, who had previously had her parental rights to her children terminated. Respondent did not participate in the parenting classes.

In October 2018, after GW's stepmother became concerned about a lesion on her vagina, then three-year-old GW was diagnosed with genital warts. Two physicians, Drs. McLean and Guertin, who had examined GW, opined that the likely source of her genital warts was sexual abuse. Respondent was ordered not to have contact with the children. The children resided with their stepmother while respondent moved in with his mother. Eventually, the children's stepmother divorced respondent and the children were moved into the care of their maternal relatives.

-1-

In early 2019, petitioner, the Department of Health and Human Services (DHHS), filed to terminate respondent's parental rights. DHHS offered respondent services, but he refused to participate. Respondent also refused to seek treatment for his mental illnesses. The trial court adjudicated the petition, concluding that respondent neglected the children by failing to provide proper care and custody. At the initial dispositional hearing, the trial court terminated respondent's parental rights. This appeal as of right follows.

## I. STATUTORY GROUNDS

First, respondent argues that there was not clear and convincing evidence to terminate his parental rights under both statutory grounds, primarily because there was no evidence that he was the source of GW's genital warts and there were other explanations as to their source.

We review the trial court's determination that a statutory ground for termination has been established for clear error. *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Kaczkowski*, 325 Mich App 69, 74; 924 NW2d 1 (2018) (quotation marks omitted). The petitioner bears the burden of establishing by clear and convincing evidence at least one statutory ground for termination of parental rights. *Hudson*, 294 Mich App at 264.

MCL 712A.19b(3)(j) provides that the trial court may terminate an individual's parental rights if it finds that:

> There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Here, the trial court did not clearly err in terminating respondent's parental rights under MCL 712A.19b(3)(j). The record here demonstrates that respondent had a series of dangerous tendencies that were harmful to the children.

Despite there being some evidence that GW's genital warts could have originated from another source, the evidence more strongly and clearly supports the trial court's conclusion that respondent infected GW by sexually abusing her. First, both Drs. McLean and Guertin opined that GW's genital warts were most likely caused by sexual trauma. Although Dr. Guertin indicated that there could have been other reasons why GW's hymen and labia were distorted, he still opined that the likely source was sexual abuse. Second, there was evidence that GW was only left unattended with one male—respondent. Third, the fact that both the children's stepmother and GW had genital warts indicates that they contracted them from respondent's sexual contact. And, even if the stepmother had been the source of respondent's genital warts, there was also no evidence that the stepmother, by caring for GW, inadvertently passed the genital warts to her. Respondent had previously videotaped his teenage stepdaughter naked from the waist down and demonstrated a preference for having sexual relations with his female

relatives.[1] There was also evidence that respondent had sexual relations with his infected cousin. Thus, this leads to the strong and reasonable inference that respondent infected GW with genital warts through sexual abuse. Respondent's sexual abuse of GW establishes that there was a likelihood that both children would be harmed if returned to his care based on his conduct and capacity, particularly because respondent denied any wrongdoing and refused to participate in any services. *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014) ("[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home.").

Even absent this strong circumstantial evidence that respondent had sexually abused GW, clear and convincing evidence demonstrated that there was a reasonable likelihood that returning the children to respondent's care and custody would result in harm. In addition to the videotaping incident, there was also evidence that respondent had observed photographs of other three-year-olds' genitalia and had photographs of another girl's clothing on his phone. Respondent also photographed his children while they were kneeling facedown with their bare buttocks in the air, which he kept in an email account on his cell phone. There was evidence that this incident emotionally harmed RW because he was frightened to go into his room with another adult because he did not want to be photographed. *Hudson*, 294 Mich App at 268 (stating that harm can be emotional under subsection (3)(j)).

Moreover, respondent's living situation and failure to address his behaviors demonstrated a likelihood of harm if the children were returned to him. Respondent continued to reside with his mother and offered no alternative living arrangement. And, before this proceeding started, he continued to allow his children to be unsupervised with their paternal grandmother despite her CPS history and CPS's warnings that she was an inappropriate caregiver. Respondent also refused to address his mental health issues or admit to any wrongdoing or problems. *Kaczkowski*, 325 Mich App at 78 (upholding the trial court's termination of a respondent's parental rights under subsection (3)(j) because she refused to seek treatment for her continued mental health issues). All of these circumstances demonstrated a reasonable likelihood that the children would be harmed if returned to respondent's care, even absent the evidence of sexual abuse.

In sum, given the evidence that respondent sexually abused GW and the other evidence of respondent's unsolved deviant sexual behaviors and mental health issues, the trial court did not clearly err in terminating his parental rights under MCL 712A.19b(3)(j). And, as we only need to find that one statutory ground was established in order to uphold the trial court's determination, we decline to address its finding that termination was also proper under MCL 712A.19b(3)(g). *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

---

[1] Without fully detailing respondent's sexual deviance, he admitted to necrophilia and the evidence showed that he repeatedly, albeit unsuccessfully, solicited his half-sister for nude photographs and sex.

## II. BEST INTERESTS

Respondent also challenges the trial court's best-interests determination.

"Whether termination of parental rights is in the best interests of the child[ren] must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We also review for clear error the trial court's ruling that termination is in the children's best interest. *Hudson*, 294 Mich App at 264.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). "The trial court may also consider a parent's . . . compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *White*, 303 Mich App at 714. When the trial court considers a child's best interests, the focus must be on the child and not the parent. *Moss*, 301 Mich App at 87-88.

Here, the trial court did not clearly err in determining that termination was in the children's best interests. The children were bonded with their maternal relatives and their children and looked to their relatives for their needs. While in the care of their relatives, the children demonstrated improvement in their behaviors and their relatives met the children's emotional and physical needs. For example, the relatives ensured that the children were going to therapy and that GW was receiving adequate treatment for her genital warts. Their relatives also provided the children with stability and were willing to care for them permanently by adopting them. *Olive/Metts*, 297 Mich App at 41-42.

In contrast, the children demonstrated no bond to respondent, never even asking about him. *White*, 303 Mich App at 714. While some of the bond may have dissipated because of the no-contact order, this order was necessary to investigate the source of GW's genital warts. Moreover, while separated from the children, respondent failed and refused to rectify any of the many problems that led to their removal. *Id*. And, in stark contrast with respondent's past and likely future abuse and neglect of the children, there was no demonstrated risk of abuse or neglect while they were in the care of their relatives. *Olive/Metts*, 297 Mich App at 41-42. This is particularly critical given GW's need for lifelong treatment for her uncurable genital warts. Given all of these circumstances, the trial court did not clearly err in determining that termination of respondent's parental rights was in the children's best interest.

Affirmed.

/s/ Mark T. Boonstra
/s/ Jonathan Tukel
/s/ Anica Letica

-4-